78 So.2d 544 (1955)
Mrs. Geneva MANSFIELD, Wife of, and Charles C. Johnson,
Mrs. Annie Howell, Wife of, and Edgar Anthony,
Mrs. Camille O'Chery, Wife of, and Julian Campisi,
v.
TOYE BROS. YELLOW CAB CO., and Its Individual Members, and Clarence Collins, In Solido.
No. 20472.
Court of Appeal of Louisiana, Orleans.
March 14, 1955.
*545 Joseph Rosenberg, New Orleans, for plaintiffs and appellants.
Deutsch, Kerrigan & Stiles, Breard Snellings, New Orleans, for Toye Bros. Yellow Cab Co., defendant and appellee.
Defendant Clarence Collins absent and unrepresented.
McBRIDE, Judge.
About 12:45 a. m., on April 30, 1953, at the corner of Leonidas and Belfast Streets, New Orleans, a collision occurred between a taxicab owned by Toye Bros. Yellow Cab Company, a partnership, and operated by William E. Harris, an employee of said partnership, and a 1939 model Ford automobile truck, owned and operated by Clarence Collins. The Yellow Cab was on Belfast Street going toward the Jefferson Parish line, and the Ford truck was being driven on Leonidas Street and was moving in the direction of the river. The three plaintiffs named in the caption of the suit were passengers in the Yellow Cab and were injured, and they allege that the accident was caused by the joint negligence of both drivers in that each failed to see and observe the other vehicle at the intersection, and they pray for a judgment against the partnership known as Toye Bros. Yellow Cab Company and the individual members thereof and against Clarence Collins, in solido, for various amounts for personal injuries, and in the suit their respective husbands join them and make claim against said defendants for medical expenses incurred and for certain losses occasioned as a result of the accident.
In making answer to the suit, Toye Bros. Yellow Cab Company and its component partners disavow negligence on the part of Harris and their answer alleges that the accident was caused solely through the fault of Clarence Collins, who drove the Ford truck; Collins denies that he was negligent and alleges that the accident was caused by the negligence of the driver of the Yellow Cab.
After the case was heard on its merits on the issues thus made up, the judge a quo absolved the driver of the taxicab from negligence and dismissed the suit as to Toye Bros. Yellow Cab Company and the members thereof; the judge attributed the accident solely to the fault of Collins, who drove the truck, and rendered judgment against him in favor of all plaintiffs for various amounts. The plaintiffs have taken this appeal from the judgment; Collins has taken no appeal, so, therefore, the primary question now before us for consideration is whether the employee of Toye Bros. Yellow Cab Company was also guilty of negligence in connection with the accident.
From the description of the intersection given by the witnesses, it appears that Leonidas Street at the point of the collision has a paved surface; Belfast Street is unimproved. Neither street is given a right-of-way status by local ordinance, and there are no traffic signs or semaphore signals at the intersection directing the movement of traffic.
The front of the Ford truck hit the Yellow Cab at about its right rear wheel, and when the impact occurred the cab had crossed more than half of the intersection.
Harris attempted to fasten the blame for the accident on Collins, who was operating the Ford truck. He admits when he reached Leonidas Street he could not see to his right into that street because the structure on the corner built up to the property lines and also parked vehicles obstructed his view. He maintains he *546 stopped and "there was no lights coming in the street at all when I started across, and I was still in first gear when he hit me." The three injured passengers emphatically deny that a stop was made by Harris before he drove the cab into Leonidas Street, and with remarkable unanimity as to the details, they say the cab was being driven between 30 to 35 miles per hour and dashed out into the intersection directly into the path of the Ford truck.
Collins' story is that he was driving the truck at 25 miles per hour along Leonidas Street, but upon nearing Belfast Street, he reduced the speed to 20 miles per hour; that when his truck reached a distance of about 20 feet away from Belfast Street, the taxicab suddenly "busted out" into the intersection from his left and immediately into his path and that his attempt to stop the truck in order to avert the crash was futile.
Whether the Yellow Cab was brought to a stop at Leonidas Street is a subject which was much discussed both in oral argument and in brief, but the conflicting contentions made by counsel need not be dwelt upon, nor is it necessary to analyze the testimony regarding the controverted point, for the obvious reason that it is entirely immaterial whether Harris did or did not bring his cab to a stop before driving it into the intersection.
Whichever view is adopted would require a conclusion that Harris was clearly at fault and that his negligence contributed to the collision between the two vehicles. If the cab made the stop before it proceeded into Leonidas Street, then Harris was guilty of the grossest negligence in abandoning a place of safety and driving his vehicle directly into the path of the truck without seeing the truck approaching on Leonidas Street; and if Harris made entry into Leonidas Street without first having stopped and without looking, it could never be denied that he was most imprudent in dashing into the intersection in utter disregard of traffic movement in the intersecting street. There is no question that when the Yellow Cab first entered into Leonidas Street, the Ford truck was in close proximity to Belfast Street, and under the rules of the road it had the right of way because it approached from the right of the taxicab.
Harris, while on the witness stand, seemed to sense his dilemma, and at one point in his testimony he gave as the excuse for not having observed the Ford truck that it was being driven without its lights turned on. But Harris' evidence as a whole convinces us that the predicate for the assertion that the Ford had no lights is the fact that whereas he saw no vehicle coming, the truck could not possibly have been lighted. This contention of the cab driver that the truck approached on Leonidas Street without headlights, we feel sure, is nothing more than an afterthought and a feeble attempt on his part to relieve himself from blame for the accident. This abundantly appears when the state of the record is taken into consideration. We notice in the answer filed by the Cab Company that after a denial of negligence on the part of its employee was made, it then is affirmatively alleged that the accident was caused solely and proximately by the negligence of Clarence Collins in seven specified particulars, but conspicuous by its absence is any specification that Collins' Ford truck was unlighted at the time of the collision. The three injured plaintiffs all testified, at a time when the question of lights on the Ford was not an issue in the case, that they only knew of the presence of the Ford in Leonidas Street when its lights flashed into the cab just before the impact. Such statement was entirely voluntary on their part as there was not one question asked said plaintiffs if the Ford truck was lighted. Collins appeared as a witness in his own behalf and we do not find in his cross-examination by counsel for the Cab Company that any questions were asked of him whether his vehicle had its lights illuminated at the time of the accident. Collins was questioned very closely regarding other details and particularly as to whether the Ford truck had a proper brake tag, but not one word was asked or said regarding the condition of his vehicle as to lights. It *547 was not until the taking of the testimony had just about been concluded and while Harris was upon the witness stand under cross-examination that anything was mentioned by him to the effect that there were no lights carried on the Ford truck. Harris on direct examination told about the corner to his right being blind and that he saw no vehicular lights on Leonidas Street and that he started across and was still in first gear when the Ford truck ran into the cab.
However, on cross-examination he made a gratuitous statement that the Ford truck was unlighted and that he could not see the truck because of that fact. That part of his cross-examination alluded to is:
"Q. There were two cars parked on either side of the intersection? A. That is right.
"Q. And as a result of the cars being parked, you couldn't see whether traffic was coming; is that right? A. That is right. You couldn't see any light.
"Q. You couldn't see any light? A. No, sir, of no automobile.
"Q. And then you took it for granted, then, that there was no traffic? A. That is right.
"Q. And then you proceeded over? A. That is right.
"Q. And then, the first thing you knew was when the car hit you? That was the first time you saw the car, was the moment of impact? A. That is right.
"Q. You hadn't seen that car before that time? A. No, sir.
* * * * * *
"Q. Well, now, what was there to stop you * * * from seeing that car if you had exercised your senses of vision and hearing? A. Because he didn't have no lights on the car.
"Q. He didn't have no lights on the car? A. No, sir.
* * * * * *
"Q. You say there were no lights on the car? A. I didn't see any.
"Q. You didn't see any? A. No, sir.
"Q. Well, you don't know whether there were any lights on the car at all, because you didn't see the car until the accident happened? A. I was looking in the street and I didn't see no car."
Thus, Harris' statement that the Ford truck was being driven without lights is unimpressive, to say the least, and we cannot accept it as the determining factor in making decision whether he was at fault in the intersectional collision.
One who operates a motor vehicle is under the duty of looking and being at all times vigilant and that duty never ceases. The motorist must see what he can see and in legal contemplation does see, and his failure to see what could have been seen by the exercise of diligence and caution does not absolve him from liability for resulting injury to others. Jackson v. Cook, 189 La. 860, 181 So. 195; Maher v. New Orleans Linen Supply Co., La.App., 41 So.2d 101; Mahne v. Steele, La.App., 32 So.2d 761; Anderson v. Morgan City Canning Co., La.App, 73 So.2d 196.
We believe the truth of the matter is that the right-hand corner being blind, to his right was entirely obliterated and he did not make further effort to obtain a clear and unhampered view into Leonidas Street before driving the cab out into the intersection. At such a blind corner, before entering the intersection a motorist must maneuver his vehicle to such a point and position as would afford him the opportunity to make observation sufficiently far into the intersecting street to discover that no traffic approaches within a distance that could be reasonably traversed before he can *548 cross the intersection. Thomas v. Checker Cab Co., La.App., 76 So.2d 757.
Counsel for the Yellow Cab Company also advanced the argument that whereas the taxicab had almost negotiated the intersection with its rear end about two-thirds across that this amounted to a preemption of the intersection which gained for Harris a right of way which Collins should have respected and not have driven his truck into the cab.
It has been said on numerous occasions by our courts that the pre-emption of an intersection does not mean a prior entry of a vehicle therein simply by a matter of a few feet or by a split second before the arrival of the other vehicle. In order to serve as the foundation for a charge of negligence, the pre-emption is to be construed to mean only an entry into an intersection with a reasonable opportunity of clearing the same under normal circumstances and without obstructing the path of an approaching vehicle so as to cause the approaching vehicle to make an emergency stop or require that its driver execute a sudden maneuver to avert an accident with the vehicle which it is claimed has made the pre-emption. Boudreaux v. Moreau, La.App., 73 So.2d 192; Anderson v. Morgan City Canning Co., supra. To say that one who blindly enters an intersection directly into the path of an approaching vehicle which is in close proximity has acquired the right of way by pre-emption merely because he negotiates the greater portion of the intersection would be absurd.
Public carriers are held to the exercise of the highest degree of care and when an accident occurs which results in the injury to a passenger, the burden of proof is upon the carrier of showing that the accident was not brought about as a result of negligence on the part of those in charge of the vehicle. Green v. Baton Rouge Bus Co., La.App., 66 So.2d 344; Young v. Toye Bros. Yellow Cab Co., La. App., 68 So.2d 107; Roy v. New Orleans Public Service, Inc., La.App., 76 So.2d 425. Not only does the evidence of Harris fail to demonstrate his freedom from fault in connection with the injuries to his three passengers, but, on the contrary, it shows beyond peradventure of doubt that he was guilty of gross fault without which the accident at the intersection in question could never have occurred.
Mrs. Johnson was not injured severely; she suffered a blow in the stomach and minor contusions of the body; she was taken to the hospital and administered a hypodermic injection. She was also given some sort of pill, the ingestion of which caused her to break out in a rash over almost her entire body which necessitated the attention of a dermatologist. The lower court awarded $150 for her bodily injuries and her husband recovered judgment for $76 to cover medical expenses and the loss of wages of his wife. We believe that the judgment in favor of Mrs. Johnson should be increased to the sum of $250.
Mrs. Anthony's injuries were quite substantial. She was conveyed to the Baptist Hospital for emergency treatment and was later attended by her own private physician. She sustained contusions and lacerations of the right foot, arm and left shoulder, and the uncontradicted medical testimony is that she sustained an egg-shell skull fracture to the left parietal bone which extended into the right parietal bone. Mrs. Anthony's physician mentioned that such type of skull fracture is "the mildest fracture you can get." She also suffered shock to the nervous system with the possibility of damage to the brain. The trial judge rendered judgment for $1,500 under authority of Thompson v. Suprena, La.App., 65 So.2d 801, wherein a like amount was awarded to a three-year-old child for a similar skull fracture, but we believe in Mrs. Anthony's case the award is inadequate for the reason that in addition to the skull fracture she sustained the contusions, the nervous shock, and the possibility *549 of brain injury. A judgment for $2,500 would subserve the ends of justice. The sum of $178.69 awarded to her husband appears to be correct; this represents medical expenses and loss of Mrs. Anthony's wages.
Mrs. Campisi's injuries consisted of contusions of the scalp, neck, knees and ankle, a sacroiliac sprain, and also shock to the nervous system. She was incapacitated for several weeks under medical treatment. She recovered $750, but we think the amount inadequate and shall increase it to $1,000. The award of $583 to her husband for medical expenses and loss of Mrs. Campisi's wages is correct.
Our conclusions in the case necessitate that part of the judgment appealed from be reversed and that the judgment be recast.
Therefore, for the reasons above assigned, it is ordered, adjudged and decreed that that portion of the judgment appealed from which dismisses the suit against Toye Bros. Yellow Cab Company and its individual members be annulled, avoided and reversed, and it is now ordered that the judgment appealed from be revised and recast so as to decree that there be judgment against all defendants, in solido, and in favor of the various plaintiffs for the amount set opposite each of their names, to-wit:

Mrs. Geneva Mansfield Johnson $250.00
Charles C. Johnson 76.00
Mrs. Annie Howell Anthony 2500.00
Edgar Anthony 178.69
Mrs. Camille O'Chery Campisi 1000.00
Julian Campisi 583.00

and as thus revised and recast, the judgment is affirmed.
Defendants are to pay the costs of both courts.
Reversed in Part; Amended and Affirmed in Part.